**FILED**

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

JUN - 5 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

LEVENSTON HALL, #82290-080
Federal Prison Camp
Plaintiff,
AO Box 12014
V. Terre Haute, Indiana 47801

Administrative Offices of the
United States Courts and
Melissa Suniga,
            Defendants.

CASE RE-ASSIGNED

BATES, J. JDB JUN 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CASE NUMBER 1:06CV01034

JUDGE: Unassigned

DECK TYPE: Pro se General Civil

DATE STAMP: 06/05/2006

## COMPLAINT

Now comes Plaintiff, Levenston Hall, pro se, and complaining of
Defendants states as follows:

1. This Court has jurisdiction over this matter pursuant to Title
28 U.S.C. §1346(b).

2. Defendant Suniga is an agent and employee of Defendant
Administrative Offices of the United States Courts (hereinafter,
"Probation Department").

3. The Defendants, through the willfully negligent acts of Defendant
Suniga have caused Plaintiff harm by virtue of his wrongful
incarceration for an extended term.

4. Defendant Suniga was assigned to prepare Plaintiff's Presentence
Investigation Report (hereinafter, "PSR") in the criminal matter,
United States of America v. Levenston Hall, W-98-CR-006 in the
Western District of Texas, Waco Division.

5. Defendant Suniga, acting in her capacity as an agent and employee
of Defendant Probation Department prepared the aforementioned
PSR dated September 25, 1998. (Exhibit A).

6. The Defendants owe Plaintiff a duty to prepare the aforesaid
report with due care and free from negligence.

7. The Defendants, through the negligence of Defendant Suniga
breached the duty of due care by attributing to the Plaintiff,
in the PSR, the actions of a different individual using the same
name.

8. The Defendants knew that such negligence would likely result
in Plaintiff's sentence in the above-captioned criminal matter
to be improperly extended as the result of the activities of the

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT
MAY 2 2 2006

other individual.

9. Plaintiff informed Defendant Suniga if the inaccuracy of the PSR by objecting thereto with respect to all of the activities of the other individual.

10. The Defendants, acting through Defendant Suniga, wrongfully refused to correct the PSR prior to sentencing.

11. As a result of the foregoing, Plaintiff was sentenced to a term of 235 months of imprisonment with respect to a crime that would have fallen within the Sentencing Guideline Range of 36 months or less without reference to the activities of the other individual wrongfully attributed to him in the PSR.

12. These many additional years of imprisonment have caused and continue to cause Plaintiff great injury including loss of liberty, lost wages and emotional distress.

13. Plaintiff repeated his request to Defendant Suniga, that she correct the PSR by deleting all references to activities of the other individual using the name "Ben Hall"  on October 17, 2005.

14. Defendants were obligated under Sellers v. Bureau of Prisons, 959 F.2d 307 (D.C. Cir. 1992) to make the requested corrections.

15. Plaintiff supported his request with sworn evidence provided by the chief investigating officer involved and with the concluding police report on the series from which Defendant Suniga derived her PSR information, that proved conclusively that Plaintiff was not the individual referred to in the police reports .

16. Defendant Suniga refused to correct the PSR.

17. Plaintiff has exhausted his administrative remedies by filing a claim under the Federal Court Claim Act (Exhibit B) which was denied by Defendant Probation Department. (Exhibit C).


WHEREFORE PLAINTIFF PRAYS for a Judgment against the Defendants in the sum of $50,000,000.00.

LEVENSTON HALL, 82299-080, pro se
Federal Prison Camp
P.O. Box 12014
Terre Haute, Indiana 47801

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA    )
                                )
            vs.            )   PRESENTENCE INVESTIGATION REPORT
                                )
LEVENSTON HALL              )   Docket No. W-98-CR-006

---

**Prepared For:**      The Honorable Walter S. Smith, Jr.
                           United States District Judge

**Prepared By:**        Melissa Suniga
                           Senior U.S. Probation Officer
                           Waco, Texas
                           (254) 750-1550, ext. 235

**Assistant U.S. Attorney**          **Defense Counsel**
Steven L. Snyder                  Stan Schwieger (A)
P.O. Box 828                      P.O. Box 975
Waco, Texas 76703            Waco, Texas 76703
(254) 750-1580                 (254) 752-5678

**Sentence Date:**    To be scheduled

**Offense:**      <u>Count 1</u>:    Possess With Intent to Distribute "Crack"
                                    Cocaine
                                    [21 U.S.C. § 841(a)(1)]
                                    40 yrs, mand. min. 5 yrs/$2,000,000 fine
                                    Class B Felony

             <u>Count 2</u>:    Distribution of "Crack" Cocaine
                                    [21 U.S.C. § 841(a)(1)]
                                    20 years/$1,000,000 fine
                                    Class C Felony

**Release Status:**    In custody.

**Detainers:**        Bell County, TX (Motion to Revoke Probation)
                          St. Clair County, IL (Motion to Revoke Prob.)
                          Green County, MO (pending charge)
                          St. Louis County, MO (pending charge)

**Codefendants:**    None

**Related Cases:**    None

**06 1034**

Mandatory Minimum: [X]

# FILED

JUN - 5 2006

**Date Report Prepared:**    09-25-98

Date Report Revised:

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PART A.  THE OFFENSE

### Charge(s) and Conviction(s)

1.  Levenston Hall was the sole defendant named in a one-count
    Indictment filed on January 13, 1998, and a two-count
    Superseding Indictment filed on February 10, 1998, in the
    United States District Court for the Western District of
    Texas, Waco Division.  The Indictment and Superseding
    Indictment charged the defendant with the offenses of
    Possession With Intent to Distribute "Crack" Cocaine and
    Distribution of "Crack" Cocaine in violation of 21 U.S.C. §
    841(a)(1).

2.  On June 9, 1998, Levenston Hall was named in a two-count
    Second Superseding Indictment which was filed in the United
    States District Court for the Western District of Texas, Waco
    Division.  Count One of the Second Superseding Indictment
    charged the defendant with Possession With Intent to
    Distribute "Crack" Cocaine in violation of Title 21, U.S.C. §
    841(a)(1).  Count Two of the Second Superseding Indictment
    charged the defendant with Distribution of "Crack" Cocaine in
    violation of Title 21, U.S.C. § 841(a)(1).

3.  On August 10, 1998, Levenston Hall was found guilty by a jury
    verdict of Counts One and Two of the Second Superseding
    Indictment.  There was no plea agreement in this case.

4.  On December 15, 1997, Levenston Hall was arrested for the
    instant offense and has been held in Federal custody since
    that date.

### The Offense Conduct

5.  The following information was taken from investigative reports
    filed by law enforcement officials with the Killeen, Texas

Police Department's Organized Crime Division (KPD-OCD).

6.  Investigator Turck of KPD-OCD learned in August, 1997 that
    KPD-OCD Investigators Lorenz and Hatfield were conducting a
    drug investigation involving Levenston Hall. Investigator
    Hatfield had received information from a confidential
    informant (CI #1) that Hall was selling large quantities of
    "crack" cocaine in Killeen from his residence at 310 Collins,
    Killeen, Texas. On September 4, 1997, CI #1 had made a
    controlled purchase of approximately 0.4 gram of "crack"
    cocaine for $50.00 from Hall. CI #1 informed Investigator
    Hatfield that Hall was still in possession of more than one
    ounce of "crack" cocaine.

7.  On September 15, 1997, CI #1 made another controlled purchase
    of approximately .2 gram of "crack" cocaine from Hall. This
    purchase, as well as the previous one, were made under
    Investigator Hatfield's supervision.

8.  On September 18, 1997, CI #1 and Investigator Lorenz met with
    Hall in the parking lot of a McDonald's in Killeen, Texas.
    Investigator Lorenz was working in an undercover capacity in
    an attempt to purchase "crack" cocaine from Hall, and wore a
    transmitter so that members of KPD-OCD could monitor the
    transaction. Hall got inside the vehicle with Lorenz and CI
    #1. Hall then sold Investigator Lorenz approximately one gram
    of "crack" cocaine for $100. (Laboratory report indicated
    1.01 grams). Hall agreed to sell Lorenz more "crack" cocaine
    at a later time. Hall gave Lorenz two pager numbers, 616-1586
    and 616-1506 and told Lorenz to contact him (Hall) at one of
    the pager numbers. Lorenz later told Investigator Turck that
    Hall was in possession of at least three or four grams of
    "crack" cocaine and that Hall had given the "crack" cocaine
    directly to him (Lorenz).

9.   On September 18, 1997, Lorenz called pager number 616-1586,
     and received a call from an individual who agreed to meet with
     him (Lorenz) and sell him "crack" cocaine.  (It should be
     noted that this is one of the pager numbers Hall had given to
     Lorenz earlier that day).  Lorenz met with two black males who
     were later identified as Quamake Javorra O'Neal (known as "Q")
     and Larry Richard Johnson.   O'Neal and Johnson sold Lorenz
     approximately  1.4  grams  of  "crack"  cocaine  for  $150.
     (Laboratory report indicated 1.17 grams).

10.  On September 29, 1997, Lorenz called both pager numbers and
     received a call several minutes later from an individual who
     agreed to sell Lorenz $100 worth of "crack" cocaine.   At
     approximately 10:55 p.m., Lorenz (wearing a transmitting
     device) met with Quamake O'Neal in a parking lot in Killeen,
     Texas, where he sold Lorenz approximately 1.2 grams of "crack"
     cocaine for $100.   The substance sold to Lorenz later tested
     positive for cocaine.

11.  During the month of September, 1997, Investigator Hatfield
     received information from CI #3 that Hall and Hall's sister,
     Felissa Hall, were both selling large amounts of "crack"
     cocaine in Killeen.   CI #3 further reported that Hall had
     rented a storage facility under the name "Richard" in Killeen
     where he kept stolen property that he had received as payment
     for "crack" cocaine.

12.  Investigators later received and confirmed information from CI
     #1 that Hall had moved from 310 Collins to 202 East Bryce,
     Apartment #58, Killeen, Texas and was selling "crack" cocaine
     out of his apartment on Bryce.  CI #1 confirmed that Hall had
     at least two other persons ("Q" and Larry) who sold "crack"
     cocaine for him and used his (Hall's) pagers.

13.  During the months of October and November, 1997, Investigator
     Lorenz  received  information  from  CI  #2,  who  was  later

identified as Russell Hairston, in reference to Hall. Hairston also reported Levenston Hall lived at 202 East Bryce, Apartment #58 and was selling large quantities of "crack" cocaine and was delivering "crack" cocaine to a black female named "Cocoa" who lived at 3316 Keith, Killeen, Texas. "Cocoa" was known by Investigator Lorenz to be Sabrina Proctor. Hairston also advised that he knew Hall purchased the "crack" cocaine from another state and transported it to Killeen where he broke it up and sold it.

14. On November 18, 1997, Investigators Turck and Chapman met with Russell Hairston. Hairston had informed investigators he could purchase a quantity of "crack" cocaine from a black male known as "Ben" and the black female known as "Cocoa". According to Hairston, he would have to contact "Cocoa" and she would have to call "Ben" and have him (Ben) bring the cocaine to her trailer located at 3316 Keith, trailer #74, Killeen, Texas. A transmitting device was placed on Hairston so that the conversation of the delivery could be monitored and taped.

15. Hairston was provided with $240 in KPD-OCD "buy money" to purchase a quarter ounce of "crack" cocaine. At approximately 12:40 p.m., Hairston called "Cocoa" and made contact with the female whom he believed to be "Cocoa" and arrangements were made for her to call "Ben." Shortly thereafter, Hairston arrived at 3316 Keith, #74. At approximately 12:55 p.m., investigators who were monitoring the conversation heard the telephone ring at the residence. When "Cocoa" got off the telephone, she told Hairston that "Ben" was going to go to his sister Felissa's house and have her bring the quarter-ounce of "crack" cocaine over. Later, "Cocoa" got another telephone call. According to "Cocoa", it was "Ben" and Felissa was on her way with the cocaine.

16. At approximately 1:16 p.m., a Honda Civic pulled up at "Cocoa's" residence. Hairston believed one of the two females in the car was Felissa Hall. Upon entering the residence, Felissa handed "Cocoa" a white napkin and "Cocoa" handed the napkin to Hairston. When Hairston opened the napkin, he saw it contained a quarter ounce of "crack" cocaine. Hairston handed Felissa $200 and departed the area. The suspected "crack" cocaine was turned over to law enforcement officials. [It should be noted that Hairston later positively identified Felissa Hall through a photographic line-up as being the person who sold the "crack" cocaine to him (Hairston)].

17. According to a Texas Department of Public Safety Laboratory Report, the "crack" cocaine weighed 0.86 gram.

18. On November 24, 1997, Investigators Turck and Chapman met with Russell Hairston. It was decided that Hairston would attempt to purchase a quarter-ounce of "crack" from Levenston Hall. Hairston (who agreed to wear a transmitting device) would go to "Cocoa's" residence so she could call Hall and make arrangements for the delivery of the "crack" cocaine. Hairston was provided with $240 in OCD "buy money" to purchase the "crack" cocaine. Hairston arrived at "Cocoa's" residence. Investigators overheard "Cocoa" making a telephone call. The monitoring device became inoperative, so it was decided that Investigator Lorenz, who had previously worked undercover, would go inside the residence. Lorenz later reported he was sitting in the living room when Hall arrived. Hall came into the residence and went into a room with Hairston. After a short period of time, Hall departed the residence. Hairston followed Hall out of the room and he (Lorenz) and Hairston left the residence. According to Hairston, Hall handed him a quarter-ounce of "crack" cocaine and Hairston gave Hall the $200 in OCD "buy money".

19. According to a Texas Department of Public Safety Laboratory report, the "crack" cocaine weighed 2.03 grams.

20. On December 10, 1997, Hairston contacted Investigators Chapman and Turck. It was determined that Hairston would attempt to purchase a quarter-ounce of "crack" cocaine for $250 from Levenston Hall, a/k/a "Ben", or Cecil Carruth. Hairston would first have to go to the residence of Sabrina Proctor, a/k/a "Cocoa". Hairston (wearing a transmitting device) was provided with $270 in OCD "buy money" to purchase the "crack" cocaine. Upon contacting Proctor at her residence, Proctor advised Hall was going to come over with some "crack" cocaine for her and she did not want to call Carruth. Proctor called Hall and made arrangements for Hall to deliver a quarter-ounce of "crack" cocaine. While talking with Hall, Proctor gave the telephone to Hairston and he (Hairston) negotiated with Hall for the purchase of the "crack" cocaine. Later, a black Toyota Camry, displaying Indiana license plates, arrived at 3316 Keith, Lot #74. When Hall arrived, Hairston, Proctor, and Hall went into a back room where Hall handed Hairston a quarter-ounce of "crack" cocaine. After looking at the "crack" cocaine, Hairston paid Hall $250 for the cocaine.

21. According to a Texas Department of Public Safety Laboratory report, the "crack" cocaine weighed 2.49 grams.

22. On December 15, 1997, investigators with KPD-OCD went to 3316 Keith, trailer #74, to positively identify a black female who resided at that location. The resident of that trailer, known as Sabrina Proctor, a/k/a "Cocoa", was a known user and seller of "crack" cocaine. A vehicle (a black Toyota Camry) recognized by Investigator Turck as belonging to Levenston "Ben" Hall was parked at the residence.

23. While investigators were identifying the persons inside the trailer, Proctor, Hall and a black male identified as Keith

Humphries walked up to the front door. When Hall saw the officers inside the trailer, he began running away from the trailer. Investigator Chapman commanded Hall to stop, but Hall did not and Investigator Chapman gave chase on foot. While chasing Hall, Investigator Chapman saw him run around the back of a red Ford truck and appear to discard a hard object as he (Chapman) heard something hit on the bumper of the truck. Investigator Chapman captured Hall and took him back to the truck where Investigator Chapman recovered some "crack" cocaine and a small amount of currency near the truck. Officers also found an electronic scale on the ground near the mobile home. When asked about the vehicle at the residence, Hall told law enforcement officials the vehicle did not belong to him and he had no idea who owned it. Hall stated he had never been inside the vehicle and did not know anything about it.

24. The other individuals inside the residence were asked about the vehicle and they stated the vehicle did not belong to them. Furthermore, Proctor advised she did not want the car on her property. The car was impounded and, during an inventory search, law enforcement officials discovered a small safe in the trunk along with Levenston Hall's wallet and several of his credit cards inside the glove compartment of the vehicle. The safe was removed from the trunk of the vehicle. Hall was again asked if the vehicle belonged to him. Hall stated the wallet was his, but he refused to say anything about the vehicle.

25. Investigator Turck asked Hall for consent to search the safe and he refused consent. Keys had been found on Hall at the time of his arrest. Found among these keys was a silver key with the word "Sentry" on it. This key turned the lock of the safe and unlocked it. However, the safe was not opened at that time. The safe was taken to Investigator Kilmer who was the narcotics canine handler for the Killeen Police Department.

26. A search warrant was obtained for the safe after Investigator Kilmore of KPD-OCD examined the outside of the safe using his narcotic sniffing dog, "Astor". "Astor" indicated the safe contained the odor of narcotics. Upon opening the safe, law enforcement officials discovered a small quantity of "crack" cocaine and marijuana along with approximately $2,428.50 in cash. According to a Drug Enforcement Administration (DEA) laboratory report, the "crack" cocaine found in the safe weighed 1.1 gram.

27. According to a Drug Enforcement Administration (DEA) laboratory report, the "crack" cocaine discarded by Hall and found near the red truck weighed 23 grams.

28. On December 16, 1997, Investigator Hatfield followed up on information he had previously received from CI #3 in reference to the defendant having a storage unit. Investigator Hatfield contacted Mary Garret, an employee of Top Mini Storage located in Killeen, Texas. Garret reported a man named Richard Samson had rented unit #824 approximately one year earlier. Then, on October 10, 1997, a black man identified as Ben Hall came into the storage facility with Richard Samson. Garret identified a photograph of Levenston Hall as being the same man who was identified as Ben Hall on October 10, 1997. According to Garret, Hall paid the rent for the unit that month and Hall advised he would be using the storage facility from that date forward. Garret stated that Samson signed the necessary paperwork which allowed Hall to use the facility. Hall was last seen using the storage facility on December 14, 1997.

29. Law enforcement officials executed the search warrant at the storage facility and recovered approximately $40,000 in property. It should be noted law enforcement officials had received information that Hall regularly provided "crack" cocaine to individuals in exchange for new items still in packaging. Officials believed these items were shoplifted

from various stores and used as payment for "crack" cocaine thereby making all of the items the proceeds from illegal drug sales. Furthermore, investigators also believe the defendant and others shoplifted property in order to later "fence" the property to buy more "dope."

30. Also on December 16, 1997, Investigator Lorenz re-confirmed that "Ben Hall" lived at 202 East Bryce, Apartment #58, and had been renting that apartment for approximately three months. A search of the apartment was conducted with no contraband being found.

31. Investigator Chapman stated he had been receiving information on Levenston Hall since approximately 1995. Chapman advised Hall was bringing in approximately one-fourth to one-half kilogram of "crack" cocaine from the St. Louis, Missouri area to the Killeen, Texas area every two to three months. However, their investigation into Hall at that time was diverted due to another major narcotics investigation. Once the other investigation was concluded, investigators went back to gathering information on Levenston Hall.

32. When the drug amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance. In making this determination, the Court may consider financial or other records, or similar transactions in controlled substance by the defendant to determine an appropriate quantity. Consequently, the U.S. currency seized in this case ($2,428.50) can be converted to two ounces of "crack" cocaine. Furthermore, Levenston Hall can be held accountable for all of the deliveries that he personally made and the deliveries made by others on his behalf. Therefore, this defendant can be held accountable for all the controlled purchases that occurred on or about September 4, 1997; September 15, 1997; September 18, 1997; September 29, 1997; November 18, 1997; November 24, 1997;

11

December 10, 1997; December 15, 1997 (recovered); and December
16, 1997 (recovered). Based on all the preceding information,
Levenston Hall can be held personally accountable for at least
118.11 grams of "crack" cocaine.

### Victim Impact

33.  There are no identifiable victims of the offense.

### Adjustment for Obstruction of Justice

34.  Pursuant to USSG § 3C1.1, if the defendant willfully
     obstructed or impeded, or attempted to obstruct or impede, the
     administration of justice during the investigation,
     prosecution, or sentencing of the instant offense, increase
     the offense level by two levels.

35.  On December 15, 1997, law enforcement officials went to 3316
     Keith, Trailer #74 to positively identify a black female who
     resided at that location. While law enforcement officials
     were at the trailer, Hall walked in, observed the officers who
     were clearly identified as police, and ran from the trailer.
     Investigator Chapman yelled at Hall to stop. However, Hall
     kept running and had to be pursued. As Hall was running, he
     discarded an item. Hall was apprehended shortly thereafter.
     Officers returned to the area where Hall had been seen
     discarding an item. Officers located 23 grams of "crack"
     cocaine.

36.  According to USSG § 3C1.1, comment. [n.3(d)], if throwing away
     a controlled substance occurred contemporaneously with arrest,
     it shall not, standing alone, be sufficient to warrant an
     enhancement for obstruction unless it resulted in a material
     hinderance to the investigation or prosecution of the instant
     offense. Furthermore, according to USSG § 3C1.1, comment.
     [n.4(d)], avoiding or fleeing from arrest ordinarily does not

warrant application of this enhancement, but may warrant a greater sentence within the applicable guideline range. Consequently, this enhancement will not be applied.

## Adjustment for Acceptance of Responsibility

37.  The presentence interview was conducted on August 14, 1998 in the presence of defense counsel.

38.  Defense counsel reported the defendant would not be making a statement regarding the instant offense.

39.  It is believed that Levenston Hall is not deserving of any reduction for acceptance of responsibility based on the following:

(a)  Hall put the Government to its burden of proof at trial by denying the essential factual elements of his guilt.

(b)  During the presentence interview, Hall failed to truthfully admit the conduct comprising the offenses of conviction.

## Offense Level Computation

40.  The November 1, 1997 edition of the Guidelines Manual has been used in this case.

Count 1 --    Possession With Intent to Distribute "Crack" Cocaine

Count 2 --    Distribution of "Crack" Cocaine

41.  Pursuant to USSG § 3D1.2(d), Counts One and Two were grouped for the purpose of determining the Base Offense Level since the level is determined largely on the basis of the total

13

amount of the quantity of a substance involved.

42. **Base Offense Level:**    The United States Sentencing Commission Guideline for violation of 21 U.S.C. § 841(a)(1) is found in USSG § 2D1.1 and is based on the Drug Quantity Table. This investigation has determined that at least 118.11 grams of "crack" cocaine were involved.    According to the Drug Quantity Table [§ 2D1.1(a)(3)(c)(4)], at least 50 grams but less than 150 grams of cocaine base results in a base offense level of 32.

32

43. **Specific Offense Characteristics:**  None.

0

44. **Victim-Related Adjustment(s):**  None.

0

45. Adjustment for Role in the Offense:  Pursuant to USSG § 3B1.1(c), if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by two levels.  In this case, undercover investigator Lorenz made a purchase of "crack" cocaine from Hall around September 18, 1997. At that time, Hall gave Lorenz two pager numbers.  Later on September 18, 1997, Lorenz called one of Hall's pager numbers.  A man called Lorenz back and agreed to sell him (Lorenz) "crack" cocaine.   Two black males, later identified as Quamake Javorra O'Neal and Larry Richard Johnson, met with Lorenz and sold Lorenz "crack" cocaine. On September 29, 1997, Lorenz called both pager numbers Hall had previously given him.   Lorenz's pages were returned and a man, who identified himself as "Q", agreed to sell Lorenz "crack" cocaine.  Information was received from CI #1 that Hall had at least two individuals who sold "crack" cocaine for him (Hall) using his (Hall's) pagers.  CI #1 identified these individuals as "Q" and Larry.   Furthermore, when Russell Hairston made an

14

undercover purchase on November 18, 1994, Sabrina Proctor, a/k/a "Cocoa", reported that Hall was going to have his sister bring the "crack" cocaine to her (Proctor's) house. All this information shows that Hall exercised a greater degree of control and authority over others. Consequently, this enhancement will be applied.    +2

46. Adjustment for Obstruction of Justice:  None.    0

47. Adjusted Offense Level (Subtotal):    34

48. Adjustment for Acceptance of Responsibility:  None.    0

49. Total Offense Level:    34

50. Chapter Four Enhancements:  None.    0

51. Total Offense Level:    34

PART B.  DEFENDANT'S CRIMINAL HISTORY

Juvenile Adjudication(s)

52. None located.

# EXHIBIT B

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 EXPIRES 3-31-91 |
|---|---|---|

**1. Submit To Appropriate Federal Agency:**

United States Probation Department
Administrative Offices of the United
States Courts
Washington, D.C. 20544

**2. Name, Address of claimant and claimant's personal representative, if any.** (See instructions on reverse.) (Number, street, city, State and Zip Code)

Levenston Hall— 82299-080
P.O. Box 12014
Terre Haute, Indiana

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH 8-24-61 | 5. MARITAL STATUS S | 6. DATE AND DAY OF ACCIDENT incident 10-17-05 | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

**8. Basis of Claim** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurence and the cause thereof) (Use additional pages if necessary.)   The U.S. Probation Office—Pretrial Services, through its agent Melissa Suniga negligently and with willful disregard of its duty to correct known and identified errors in Claimants file (as imposed in Sellers v. Bureau of Prisons, 959 F.2d 307 (D.C. Cir. 1992)), caused tortious damages by virtue of prolonged wrongful imprisonment. Claimant's Presentence Report mistakenly identifies him as the individual involved in a series of drug sales and direct interaction with the chief investigating police officer, while that officer has twice testified under oath that Claimant is _not_ the individual described in the reports (though he has the same name) The series of reports culminate with a statement that the Claimant is not the same Ben Hall as the one in the reports. The refusal of the probation Department to correct the PSR results in Claimant's wrongful incarceration on a continuing basis.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.   Claimant suffers wrongful imprisonment, lost wages, current and future emotional distress and improper categorization and treatment by the Bureau of Prisons as a direct consequence of the ongoing refusal to correct the PSR.

**11. WITNESSES**

06 1034

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|

FILED

JUN - 5 2006

**12. (See instructions on reverse)**   **AMOUNT OF CLAIM (in dollars)**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY $50,000,000.00 | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) $50,000,000.00 |
|---|---|---|---|

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM The claimant shall forfeit and pay to the United States the sum of $2,000, plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |
|---|---|

95-108
Previous editions not usable.

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3),
and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the
following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28
C.F.R. Part 14.

B. *Principal Purpose:* Information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you
are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply
the requested information or to execute the form may render your claim "invalid"

## INSTRUCTIONS

Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL
AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR
LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER
WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR
MONEY DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be
furnished, upon request, by the office indicated in item #1 on the reverse side.
Complete regulations pertaining to claims asserted under the Federal Tort Claims Act
can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have
published supplemental regulations also. If more than one agency is involved, please
state each agency.

The claim may be filed by a duly authorized agent or other legal representative,
provided evidence satisfactory to the Government is submitted with said claim
establishing express authority to act for the claimant. A claim presented by an agent or
legal representative must be presented in the name of the claimant. If the claim is
signed by the agent or legal representative, it must show the title or legal capacity of
the person signing and be accompanied by evidence of his/her authority to present a
claim on behalf of the claimant as agent, executor, administrator, parent, guardian or
other representative.

If claimant intends to file claim for both personal injury and property damage, claim
for both must be shown in item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit
a written report by the attending physician, showing the nature and extent of injury,
the nature and extent of treatment, the degree of permanent disability, if any, the
prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills
for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY
REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE
APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM
ACCRUES.

(b) In support of claims for damage to property which has been or can be
economically repaired, the claimant should submit at least two itemized signed
statements or estimates by reliable, disinterested concerns, or, if payment has been
made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable
or if the property is lost or destroyed, the claimant should submit statements as to the
original cost of the property, the date of purchase, and the value of the property, both
before and after the incident. Such statements should be by disinterested competent
persons, preferably reputable dealers or officials familiar with the type of property
damaged, or by two or more competitive bidders, and should be certified as being just
and correct.

(d) Failure to completely execute this form or to supply the requested material
within two years from the date the allegations accrued may render your claim "invalid".
A claim is deemed presented when it is received by the appropriate agency, not when
it is mailed.

Failure to specify a sum certain will result in invalid presentation of your claim
and may result in forfeiture of your rights.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing
data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or
any other aspect of this collection of information, including suggestions for reducing this burden,

to  Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC  20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance?  ☐ Yes. If yes, give name and address of insurance company (Number, street, city, State, and Zip Code) and policy number.  ☐ No

16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?

17. If deductible, state amount

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? (It is necessary that you ascertain these facts)

19. Do you carry public liability and property damage insurance?  ☐ Yes. If yes, give name and address of insurance carrier (Number, street, city, State, and Zip Code)  ☐ No

# EXHIBIT
# C



LEONIDAS RALPH MECHAM<br>
Director<br><br>
CLARENCE A. LEE, JR.<br>
Associate Director

# ADMINISTRATIVE OFFICE OF THE
# UNITED STATES COURTS

WASHINGTON, D.C. 20544

WILLIAM R. BURCHILL, JR.<br>
Associate Director<br>
and General Counsel<br><br>
ROBERT K. LOESCHE<br>
Deputy General Counsel

**April 13, 2006**

<u>CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Levenston Hall
82299-080
Federal Prison Camp
P.O. Box 12014
Terre Haute, IN 47801

Dear Mr. Hall:

This will serve as formal notification that the Administrative Office of the United States Courts has denied in full your tort claim dated January 26, 2006, for $50 million based on wrongful imprisonment, lost wages and personal injuries that allegedly resulted from errors in your pre-sentence investigation report.

It is this agency's conclusion that, because the injuries alleged in your claim arise entirely from the preparation of a pre-sentence report by a United States probation officer, a matter well within the scope of her official duties, the claim may not be settled under authority of the Federal Tort Claims Act 28 U.S.C. § 2671-2680. The United States may assert absolute immunity from liability. 28 U.S.C. § 2674. In addition, you have not proven negligence on the part of a federal officer or employee that could give rise to tort liability under state law. 28 U.S.C. § 2672.

I am required by regulations of the Department of Justice to advise you that, if you are dissatisfied with this agency's disposition of your claim, you have the right to file suit in an appropriate United States district court within six months of the date of mailing of this notification.

Sincerely,

*John Chastain*

John L. Chastain
Assistant General Counsel

**06 1034**
**FILED**

JUN - 5 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY